[Cite as *In re T.C.*, 2023-Ohio-1922.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re T.C., B.S.

Court of Appeals No.  L-22-1222

Trial Court No.  JC 21283539

**DECISION AND JUDGMENT**

Decided:  June 9, 2023

* * * * *

Adam H. Houser, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant-mother T.S. appeals the judgment of the Lucas County Court of

Common Pleas, Juvenile Division, which terminated her parental rights and awarded

custody of the minor children, T.C. and B.S., to appellee Lucas County Children Services

("LCCS").  For the reasons that follow, the trial court's judgment is affirmed.

## I. Facts and Procedural Background

{¶ 2} T.S. is the mother of T.C., born in 2017, and B.S., born in 2019.[1] The present matter was initiated on March 5, 2021, when LCCS filed a complaint in dependency, abuse, and neglect.

{¶ 3} The complaint alleged that on February 15, 2021, LCCS received a referral that in December 2020, mother's boyfriend stabbed her in the presence of the children and bit T.C.'s finger. The complaint also alleged that mother was homeless and stayed in drug houses. Mother admitted to the caseworker that she had previously used Percocet and cocaine, and that she had no independent housing or employment. At the time, mother and the children were residing with S.S.

{¶ 4} On February 25, 2021, LCCS received another referral that T.C. put his hands down the diaper of S.S.'s baby and that T.C. reported that "Mikey" (age 11 or 12) touched T.C. inappropriately and had put toys up B.S.'s "cooch."

{¶ 5} On March 1, 2021, it was reported to LCCS that mother was being prostituted by S.S. On March 2, 2021, mother confirmed that S.S. was making her engage in prostitution and told the caseworker that S.S. threatened her. The caseworker went to the home on March 3, 2021, but found that mother had left the children with S.S. while she was in Toledo with her boyfriend.

---

[1] T.C.'s father, T.C., Sr., has not appealed the trial court's termination of his parental rights. B.S.'s father has never been identified.

2.

**{¶ 6}** Finally, the complaint alleged that mother failed to drop urine as requested on February 26 and March 1, 2021, but that she tested negative for substances on March 2, 2021.

**{¶ 7}** A shelter care hearing was held on March 5, 2021, at which the trial court placed the children into the interim temporary custody of LCCS. At the subsequent adjudication and disposition hearing on April 15, 2021, mother consented to a finding that the children were dependent, abused, and neglected, and consented to LCCS being awarded temporary custody. A case plan was developed and services were provided to assist mother in addressing the concerns of being a victim of domestic violence, making poor parenting choices, having a history of substance abuse, and being homeless.

**{¶ 8}** On January 14, 2022, LCCS moved for permanent custody of B.S.

**{¶ 9}** On March 2, 2022, the trial court held an annual review hearing. At the hearing, Madison Williams, the LCCS caseworker, testified that mother was recommended for a dual diagnostic assessment in February 2021, but missed her appointments in March, April, and May 2021. Mother finally completed her dual diagnostic assessment at Unison in July 2021 and was recommended for non-intensive outpatient services. Unison discharged mother in September 2021 for not attending her classes. In December 2021, mother engaged with New Concepts to receive non-intensive outpatient services and had been actively participating in those services through the time of the annual review hearing. In addition, mother was referred for domestic violence survivor's classes in February 2022, and had been attending those as well. Mother also

3.

was recommended for housing services and she was still working on obtaining stable, independent housing. Finally, Williams testified that mother would be referred to parenting services once she made more progress on her other services. As a result of the annual review hearing, the trial court extended LCCS's temporary custody of the children.

{¶ 10} On April 28, 2022, LCCS moved for permanent custody of T.C.

{¶ 11} At the August 24, 2022 permanent custody hearing, Williams testified that communication with mother is very sporadic. Mother's voice mailbox is always full, so Williams is never able to leave a message. Most of their communication occurs via text message, but Williams testified that mother is generally not communicative unless she has an issue with her visitation. Originally, Williams had her monthly meeting with mother at the residence where mother was living with her partner's mother. However, once mother and the other residents were evicted, Williams unsuccessfully attempted to locate a new address for mother. Rather than provide a new address, mother asked Williams to have their monthly meetings at Tim Horton's, which did not happen. Williams alternatively asked mother to meet her at the agency, but mother never did.

{¶ 12} As to services, Williams testified that mother has not completed the non-intensive outpatient services at New Concepts, and described that mother has made "little to no progress." Williams identified records from New Concepts from May, June, and July 2022, which showed generally that mother had been inconsistent with her treatment having recorded several no-call/no-show appointments. The no-call/no-show

4.

appointments were for scheduled phone appointments where mother did not answer and her voicemail inbox was full. The records also showed that mother still regularly used marijuana, but claimed to have been sober from other drugs. In addition, the records showed that mother reported that she was still homeless and was having difficulty securing housing. As to other services, Williams testified that at one point mother was receiving domestic violence victim's services from Providence Center, but Williams did not have any records showing that mother completed the services. Mother had not yet been referred to parenting services because of her lack of progress in the other areas.

{¶ 13} Williams also testified to mother's history of drug usage. Williams testified that throughout the pendency of LCCS's involvement, the agency had requested mother to provide urine screens 13 times. Mother only complied and provided a urine screen three of those times, the last one being on May 16, 2022. The agency's policy, as explained to mother, is that a no-show for a urine screen is treated as a positive test for all substances. Of the screens that mother did provide, all three tested positive for THC and two tested positive for cocaine.

{¶ 14} Regarding mother's housing situation, Williams testified that when she first became involved in February 2022, mother was living with her partner's mother. Thereafter, the residents were evicted and mother would not tell Williams where she was living. At the time of the hearing, Williams did not know where mother was living. Notably, mother sent Williams a "very bad photo" of a document that mother claimed was a lease, but the document contained no address or identifying information.

5.

{¶ 15} Williams also explained that mother's partner, L.A., has a long criminal history, with a current pending charge for domestic violence. Williams noted that it has long been speculated that L.A. was trafficking and abusing mother. Mother has previously admitted to being in a relationship with L.A., and in June 2022, Williams observed mother's Facebook posts that show that she is now married to L.A. Williams has been unable to engage with L.A. to determine if he needs services as well.

{¶ 16} As to visitations with the children, Williams testified that since January 2022, there have been 32 scheduled visits. Mother appeared for only 16 of them. Williams testified that the majority of missed visits were no-call/no-show. When Williams first became involved in February 2022, mother was required to call one hour before the scheduled visit because of her history of being inconsistent and missing visitations. Mother continued to be inconsistent and not call, so she was then required to arrive one hour before the scheduled visit. Again, mother was inconsistent. Williams has not observed any visits between mother and the children.

{¶ 17} Finally, Williams testified that the children are doing very well in their foster home. They are developing, hitting their milestones, and getting smarter every day. Williams testified that it is clear the children are bonded to each other and to their foster parents.

{¶ 18} On cross-examination, Williams testified that she was concerned about the children returning to mother because of mother's substance abuse issues, her relationship with L.A., and her lack of proper housing. Williams testified that she also received a call

from mother's case manager at New Concepts, who stated that she was in fear of the children going home to mother because mother has not made any lifestyle changes.

{¶ 19} In addition to Williams's testimony, LCCS called the children's foster parents, W.S. and R.S., as witnesses. The foster parents testified that the children are doing well in the home and are growing and developing. The foster parents affirmed that they would be interested in adopting the children if that was a possibility.

{¶ 20} Finally, Megan Ward, the guardian ad litem, testified. In addition to submitting her report, Ward testified that she does not believe that it would be in the best interest of the children to be reunified with mother. Ward explained that mother has not made any lifestyle changes and while mother has made some effort with her services, she has not been successful. Ward noted mother's recent positive cocaine screen in May 2022, and her social media posts and photographs that show that she is engaged or married to a man that has a pending domestic violence felony charge. Ward testified that she has not spoken to mother since May 2022, despite repeated attempts. Ward testified that she has been involved in the case for a long time and has seen the children grow, develop, and be successful in the current foster placement with foster parents that are one hundred percent committed to the children. For all those reasons, Ward recommended that permanent custody of the children be awarded to LCCS.

{¶ 21} In her closing argument at the hearing, mother requested that the court not prematurely award permanent custody of the children to LCCS, but instead requested that

7.

the court grant an extension of time for mother to successfully complete her services and reunite with the children. The trial court took the matter under advisement.

{¶ 22} Following the permanent custody hearing, the trial court entered its judgment terminating mother's parental rights and awarding permanent custody of the children to LCCS. As to mother, the trial court found by clear and convincing evidence that the children cannot be placed with her within a reasonable time or should not be placed with her. Specifically, the trial court found under R.C. 2151.414(E)(1) that notwithstanding reasonable case planning and diligent efforts by LCCS, mother has failed continuously and repeatedly to remedy the conditions that caused the children to be placed outside of the family home in that mother has failed to substantially comply with case plan services. The trial court also found under R.C. 2151.414(E)(4) that mother has demonstrated a lack of commitment to the children by failing to regularly support or visit with the children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home. In particular, the court found that mother's visits have been sporadic and mother has failed to make the necessary lifestyle changes in that she continues to abuse illegal drugs, does not have stable, independent housing, and has not been consistent with substance abuse and mental health services.

{¶ 23} Finally, the trial court found under R.C. 2151.414(D)(1) that it was in the best interest of the children to award permanent custody to LCCS for adoptive placement and planning. The court noted that the children are thriving in a prospective adoptive home and are bonded with their foster family. The court also noted that mother has made

8.

little progress in her case plan services since March 2021, not enough progress to support an extension of time, and the children deserve a legally safe, secure, and permanent environment.

## II. Assignments of Error

{¶ 24} Mother has timely appealed the judgment terminating her parental rights and now asserts four assignments of error for our review:

1. Lucas County Children Services failed to make reasonable efforts when they failed to properly investigate mother's home and who she was residing with.

2. It was against the manifest weight of evidence for the trial court to grant permanent custody to Lucas County Children Services when appellant was being substantially compliant with case plan services.

3. Trial court made reversible error when it failed to grant appellant's motion for extension of time.

4. Appellant received ineffective assistance of counsel when trial counsel failed to object and allowed impermissible hearsay to be considered by the trial court.

## III. Analysis

{¶ 25} In her first three assignments of error, mother challenges the trial court's decision to terminate her parental rights.

{¶ 26} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 6th Dist. Lucas No. L-22-1219, 2023-Ohio-1663, ¶ 27, citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 27} In addition, the trial court, as the trier of fact, is in the best position to weigh the evidence and evaluate the testimony. *In re A.H.* at ¶ 11, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). "Thus, in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re S.S.* at ¶ 28, quoting *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 42.

{¶ 28} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find two things by clear and convincing evidence: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the

10.

child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Cross* at paragraph three of the syllabus.

{¶ 29} In this case, mother contests the trial court's finding that R.C. 2151.414(B)(1)(a) applies. Mother does not separately contest the trial court's determination that permanent custody is in the best interests of the children.

{¶ 30} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

{¶ 31} Here, the trial court found that R.C. 2151.414(E)(1) and (4) applied to mother. R.C. 2151.414(E)(1) states,

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(4) states,

> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

**{¶ 32}** In her first assignment of error, mother argues that the trial court relied on her homelessness when deciding to award permanent custody to LCCS. Mother asserts, however, that she provided a lease to her caseworker and LCCS failed to follow up with her to ask for her address or to investigate her living situation. Thus, mother contends both that LCCS failed to make reasonable efforts to reunify the family and that the trial court's finding regarding her homelessness was against the manifest weight of the evidence.

**{¶ 33}** As to the reasonable efforts argument, "[t]he state must make reasonable efforts to reunify the family before terminating parental rights." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 4. "In determining whether the agency made reasonable efforts, 'the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'" *In re I.P.*, 6th Dist. Lucas No. L-15-1136, 2015-Ohio-4061, ¶ 37, quoting *In re D.H.*, 6th Dist. Lucas No. L-13-1152, 2013-Ohio-5286, ¶ 21. "'[R]easonable effort' is an 'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.*, quoting *In re D.H.* at ¶ 21.

**{¶ 34}** Here, Williams attempted to contact mother numerous times over the course of several months before the permanent custody hearing. Williams also did a separate search for an address for mother, which was unsuccessful. Despite these numerous attempts, mother never provided an address to Williams. Instead, mother texted a low-quality photo of a document that she claimed was a lease, but which did not

13.

include any identifying information. Identifying an address to determine mother's living situation is a simple task that should not require an extraordinary effort on the part of the caseworker. The caseworker made reasonable attempts to find mother's address, but mother's conduct evidenced that she clearly did not want to provide it to the caseworker. Therefore, the trial court's finding that LCCS made reasonable efforts to reunify the family is not against the manifest weight of the evidence.

{¶ 35} As to the trial court's finding that mother was homeless, that issue dovetails with her second assignment of error, in which she argues that the trial court's finding under R.C. 2151.414(E)(1) is against the manifest weight of the evidence. In support of her second assignment of error, mother asserts that she was progressing on her case plan services because she was in treatment for her mental health and drug issues, was working, and had an apartment of her own.

{¶ 36} Although the record discloses that mother was working at the time of the permanent custody hearing, it does not support the conclusion that mother was progressing on her case plan services or that she had an apartment of her own. To the contrary, the record demonstrates that mother was inconsistent in her case plan services. She was initially referred for a dual diagnostic assessment in February 2021, but did not complete it until July 2021, and did not begin to successfully engage in the services until December 2021. Even then, mother's participation was inconsistent as evidenced by numerous no-call/no-shows in the few months preceding the permanent custody hearing. Mother's sporadic participation is consistent with her pattern of poor communication

with her LCCS caseworker and the guardian-ad-litem. Mother also continued to use illicit substances, testing positive for marijuana three times and cocaine twice, including one time within three months of the permanent custody hearing, not to mention the thirteen other times that she failed to provide a urine screen. Further, although mother claims in her appellate brief that she had an apartment of her own, there is no evidence in the record to support such a conclusion. To the contrary, mother's unwillingness to provide an address to Williams and her social media posts describing her ongoing relationship and marriage to a person who has a long criminal history and pending domestic violence felony charges manifestly supports the conclusion that mother did not have independent, safe, and stable housing. Accordingly, the trial court's finding under R.C. 2151.414(E)(1) that mother has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home is not against the manifest weight of the evidence.

{¶ 37} Relatedly, in her third assignment of error, mother argues that the trial court should have allowed her an extension of time of seven months to complete her case plan services. R.C. 2151.414(B)(1)(a) requires the trial court to determine that the children cannot be placed with their parent within a reasonable time. R.C. 2151.414(E)(1) requires such a finding where the parent has failed "continuously and repeatedly" to substantially remedy the conditions that caused the children to be removed from the home. Here, LCCS has been providing mother services for 17 months. During that time, mother has not been consistent in engaging with the services, her caseworker,

or the guardian ad litem, and tragically has not made any lifestyle changes demonstrating that she is on a path to providing a safe, stable home for the children. Instead, mother continues to use illegal substances, avoids her caseworker, and associates and resides with people who would not foster a safe environment for the children. As such, the factor under R.C. 2151.414(B)(1)(a) has been met and the record contains no indication that delaying permanency for the children for another seven months would lead to a different result. Therefore, the trial court did not err in denying mother's oral motion for an extension of time.

{¶ 38} Accordingly, mother's first, second, and third assignments of error are not well-taken.

{¶ 39} Finally, in her fourth assignment of error, mother argues that she received ineffective assistance of counsel when her trial counsel failed to object to Williams's hearsay statement that mother's case manager at New Concepts told Williams that she was in fear of the children going home to mother because mother has not made any lifestyle changes.

{¶ 40} "The test for ineffective assistance of counsel in a parental rights termination proceeding is the same as that used in criminal cases." *In re G.P.*, 6th Dist. Lucas Nos. L-18-1126, L-18-1130, L-18-1132, 2018-Ohio-4584, ¶ 76, citing *In re T.C.*, 6th Dist. Lucas No. L-16-1154, 2016-Ohio-7631, ¶ 30. To prevail on a claim of ineffective assistance, mother must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for

16.

counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Id.* at 697.

{¶ 41} Here, mother cannot demonstrate a reasonable probability exists that the results of the proceedings would have been different had counsel objected to the hearsay testimony and had it stricken. The remaining evidence presented at the permanent custody hearing overwhelmingly supports the trial court's determination under R.C. 2151.414(E)(1) that mother continuously and repeatedly failed to remedy the conditions causing the removal of the children. The inclusion of the New Concepts case manager's opinion that she was in fear of the children going home to mother was harmless in the context of the entire proceedings.

{¶ 42} Accordingly, mother's fourth assignment of error is not well-taken.

### IV. Conclusion

{¶ 43} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

17.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
                           JUDGE

Myron C. Duhart, P.J.

Charles E. Sulek, J.
                           JUDGE
CONCUR.

                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.